OAO91 (Rev. 12/03)  Criminal Complaint

# UNITED STATES DISTRICT COURT

NORTHERN    DISTRICT OF    CALIFORNIA

UNITED STATES OF AMERICA
V.

JOHNSON MAI, et al.
(SEE ATTACHMENT)

(Name and Address of Defendant)

**F I L E D**

CRIMINAL COMPLAINT

JUL 2 7 2006
Case Number:

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

3  06  70479  EMC

I, the undersigned complainant state that the following is true and correct to the best of my

knowledge and belief. On or about _____ 2000-2005 _____ in _____ San Francisco _____ County, in
                                              (Date)

the _____ Northern _____ District of _____ California _____ defendant(s) did,

(Track Statutory Language of Offense)
SEE AFFIDAVIT ALEO BRUGNARA, attached hereto

in violation of Title _____ 18 and 21 _____ United States Code, Section(s) _____ 1956 & 1957 and 846 _____ .

I further state that I am a(n) _____ Special Agent, ICE _____ and that this complaint is based on the
                                              Official Title

following facts:

   SEE AFFIDAVIT OF ALEO BRUGNARA

Continued on the attached sheet and made a part of this complaint:    ☒ Yes    ☐ No

_____
Signature of Complainant

ALEO BRUGNARA
Printed Name of Complainant

Sworn to before me and signed in my presence,

_____
Date

BERNARD ZIMMERMAN
HON. EDWARD M. CHEN    Magistrate
Name of Judge    Title of Judge

at    San Francisco    California
         City              State

_____
Signature of Judge

## ATTACHMENT TO COMPLAINT

**JOHNSON MAI,**
a/k/a Zhi Xiong Mai, a/k/a Uncle Hong,
a/k/a Chi Hong Mak, a/k/a Hong Suk
1220 Kenilworth Drive, Hillsborough, California;
**LISA LEE,**
a/k/a Xiao Ling Li
1220 Kenilworth Drive, Hillsborough, California;
**KAI LUN ZHENG,**
a/k/a Wai Keung Cheung, a/k/a Su Ming,
a/k/a Alan Zheng;
**ZHI EN HUANG,**
a/k/a Gao Lo
1927 Bridgepointe Circle, Apartment H344
San Mateo, California;
**DAVID YUEN,**
a/k/a Lo Wu, a/k/a Wu So Gor
3018 Humboldt Avenue
Oakland, California; and
**ERIC YU HENG CAI,**
166 Los Robles Drive
Burlingame, California

NORTHERN DISTRICT OF CALIFORNIA    )
                                   )                    AFFIDAVIT
CITY & COUNTY OF SAN FRANCISCO     )
                                   )

I, Aleo Brugnara, being duly sworn, do depose and state:

I am a Special Agent for Immigration and Customs Enforcement (ICE), Department of Homeland Security, assigned to the Office of the Special Agent in Charge, San Francisco. I have been employed as a Special Agent for ICE/United States Customs for approximately twenty years. I am cross-designated as a Special Agent for the Drug Enforcement Administration. My responsibilities include the investigation of federal drug and money laundering laws. I have received general training in federal criminal laws and criminal investigation, and specialized training in the enforcement of federal laws involving the trafficking of controlled substances and the laundering of the proceeds of drug trafficking. In the course of my career I have conducted or participated in several hundred federal drug and/or money laundering investigations.

Since September of 2001, I have been the case agent for the investigation described in this affidavit. The facts set forth in this affidavit are known to me from my own investigation, from my review of reports of related investigations, from my training and experience, and from my conversations with other agents of ICE and the Drug Enforcement Administration.

This affidavit is in support of a criminal complaint for violations of Title 21, United States Code, Section 846, Conspiracy to Possess Controlled Substances with intent to Distribute against:

1) **JOHNSON MAI**, also known as "ZHI XIONG MAI", "UNCLE HONG", "CHI HONG MAK", and "HONG SUK", date of birth November 27, 1962;

2) **LISA LEE**, also known as "XIAO LING LI", date of birth April 8, 1964 (alternate date of birth April 8, 1962);

3) **KAI LUN ZHENG**, also known as "WAI KEUNG CHEUNG", "SU MING", and "ALAN ZHENG", date of birth April 14, 1969;

4) **ZHI EN HUANG**, also known as "GAO LO", date of birth January 22, 1969;

5) **DAVID YUEN**, also known as "LO WU", and "WU SO GOR", date of birth September 6, 1968;

6) **ERIC YU HENG CAI**, date of birth April 1, 1972.
This affidavit will show that between approximately 2000 and October of 2004, the aforementioned individuals conspired to distribute approximately 906 kilograms (approximately 3,624,000 pills) of 3,4 methylkenedioxy-methamphetamine (hereinafter referred to as MDMA).

This affidavit is also in support of a criminal complaint for violations of Title 18 United States Code, Section 1956 (a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(A), (a)(2)(B), Laundering of Monetary Instruments against:

1) **JOHNSON MAI**, also known as "ZHI XIONG MAI", "UNCLE HONG", "CHI HONG MAK", and "HONG SUK", date of birth November 27, 1962;

2) **LISA LEE**, also known as "XIAO LING LI", date of birth April 8, 1964 (alternate date of birth April 8, 1962);

3) **KAI LUN ZHENG**, also known as "WAI KEUNG CHEUNG", "SU MING", and "ALAN ZHENG", date of birth April 14, 1969;

4) **ZHI EN HUANG**, also known as "GAO LO", date of birth January 22, 1969;

5) **ERIC YU HENG CAI**, date of birth April 1, 1972.

This affidavit will show that between November 8, 2000 and July 2005, the aforementioned individuals conducted financials transactions totaling $3,216,000, knowing that the financial transactions were designed to conceal the fact that the source of the funds were the proceeds of violations of Title 21 United States Code 846, and Title 18 United States Code 1955 (Illegal Gambling Business); or knowing that the financial transactions were intended to promote the carrying on of the aforementioned specified unlawful activities; or that the aforementioned individuals knowingly transported or transferred funds from a place in the United States to a place outside of the United States, or from a place outside of the United States to a place in the United States, with the intent of carrying on the aforementioned specified unlawful activities, or knowing that the funds represented the proceeds of the aforementioned specified unlawful activities.

This affidavit is also in support of an Application for Search Warrants for the following residences:

1) **1220 KENILWORTH ROAD, HILLSBOROUGH, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the residence of JOHNSON MAI and LISA LEE. As stated below, I believe this residence is used to store records and indicia related to the importation and distribution of controlled substances, as well as money laundering;

2) **823 EAST 24th STREET, APARTMENT 1, OAKLAND, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the mailing address of JOHNSON MAI and LISA LEE, and the residence of LI's parents, Rong An Li and Annie Guan. As stated below,

3

I believe this residence is used to store records and indicia related to the importation and distribution of controlled substances, as well as money laundering;

3) **1927 BRIDGEPOINTE CIRCLE, APARTMENT H344, SAN MATEO, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the residence of ZHI EN HUANG. As stated below, I believe this residence is used to store records and indicia related to the importation and distribution of controlled substances, as well as money laundering;

4) **3018 HUMBOLDT AVENUE, OAKLAND, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the residence of DAVID YUEN. As stated below, I believe this residence is used to store records and indicia related to the importation and distribution of controlled substances, as well as money laundering;

5) **166 LOS ROBLES DRIVE, BURLINGAME, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the residence of ERIC YU HENG CAI. As stated below, I believe this residence is used to store records and indicia related to the importation and distribution of controlled substances, as well as money laundering;

6) **335 GLASGOW CIRCLE, DANVILLE, CA**, further described in Attachment No. 2 to the Application for the Search Warrants, is the residence of Stephanie Cai, ERIC CAI's sister. As stated below, I believe this residence is used to store records and indicia related to money laundering.

Based upon my training, experience, and participation in this investigation, as well as numerous other investigations involving the distribution of large amounts of controlled substances and related money laundering, I know:

4

a) That persons who traffic in controlled substances
usually keep quantities of the substance in and around their
residence for immediate sale;

b) That persons who traffic in controlled substances
commonly keep a quantity of the substance on their person for
immediate sale;

c) That persons who traffic in controlled substances
commonly use automobiles as a storage area for quantities of the
substance;

d) That persons who traffic in controlled substances
resupply themselves when their supply of the substance becomes low or
is exhausted;

e) That persons who traffic in controlled substances
commonly have in their possession items of paraphernalia which are
associated with the distribution, sales, storage and use of
methamphetamine; such as scales, weighing devices, baggies, plastic
envelopes, sifters, grinders, cutting and adulterating agents,
hypodermic needles and syringes, pipes and other smoking devices;

f) That persons who traffic in controlled substances and
money launderers commonly have in their possession paper writings or
records that evidence dealing and sale of the substance; such as
address books, ledgers, lists, notebooks, computer systems, computer
disks, and audio and video recordings, as other electronic data
storage devices;

g) That persons who traffic in controlled substances and

5

money launderers commonly retain the proceeds of sales of the substance; such as currency and coin, stock certificates, bonds and precious metals;

h) That traffickers in controlled substances commonly use cellular telephones and radio paging devices to conduct their sales and deliveries;

i) That persons who traffic in controlled substances commonly take orders for the substance over the telephone and make arrangements for pick-up or delivery of the substance - the so-called "phone buy" method. Thus, I request that this warrant authorize searching officers to answer the residence and/or cellular telephone of the person who is the subject of this investigation and his suspected confederates, and converse with callers who appear to be calling with regard to MDMA and note or record the conversation without revealing their true identity. It is my opinion that persons will call ordering controlled substances and that such calls will constitute evidence of the commission of a felony;

j) I am aware that persons who traffic in controlled substances commonly use radio paging devices to receive messages to contact their customers and suppliers. Thus, I request that this warrant authorize searching officers to receive and record all incoming pages and to place a telephone call to the indicated telephone number and converse with callers who appear to be calling in regard to controlled substances and to note or record the conversation without revealing their true identity. It is my opinion that such pages and telephone calls will constitute evidence of the commission of a felony;

6

k) I am aware that virtually all traffickers in controlled substances are involved in a conspiracy with other persons to traffic, sell and distribute the substance. I am aware that members of such a conspiracy commonly keep information about the other members of the conspiracy; such as documents, records and printed or handwritten papers;

l) I am aware that persons who traffic in controlled substances and money launderers commonly keep within their residences and/or vehicles items of indicia which tend to show the identity of the person or persons in control of the premises or vehicles; such as utility bills, lease agreements, rent receipts, canceled mail envelopes and cards, telephone bills, canceled checks, bank statements, savings account passbooks, deposit receipts, passports, diaries, social security cards, drivers licenses, vehicle registration and title papers, land titles, escrow papers, tax receipts, identification cards, photographs and keys;

m) I am aware that traffickers in controlled substances commonly have available and carry firearms to protect themselves, their product, and proceeds from sales of controlled substances, from rival traffickers and those who would rob them of their drugs and money. Traffickers also avail themselves of firearms to resist the efforts of police to investigate their activities and apprehend them, including the use of armed resistance during the service of search warrants. It is my opinion that any such firearms constitute further evidence of narcotics trafficking in that they are commonly associated with those actively engaged in this criminal enterprise;

7

n) That drug traffickers and money launderers commonly maintain the records and items described above in their residence and in the residence of relatives for an extended period of time.

## I. OVERVIEW OF THE INVESTIGATION

1. This affidavit will establish probable cause that since at least 2000, JOHNSON MAI has overseen a continuing criminal enterprise involved in the importation and distribution in the United States of at least 906 kilograms of MDMA and the laundering of at least $3,216,000. The affidavit further breaks this conspiracy down into specific phases, with probable cause of violations of 21 USC 846 and 18 USC 1956 for each phase summarized in the following sections:

(a) Section IV will show that between January 2001 and June 2002, MAI, assisted by LISA LEE, ZHI EN HUANG, KAI LUN ZHENG, Jingsan Li (deceased), and ERIC CAI, imported at least 14 BMW transmissions (containing approximately 8 kilograms of MDMA each, for a total of 112 kilograms), 8 Schimmel and/or Euterpe pianos (containing approximately 40.5 kilograms of MDMA each, for a total of 324 kilograms), and 5 leather sofas (containing approximately 34 kilograms of MDMA each, for a total 170 kilograms) from western Europe into San Francisco International Airport; and that ZHI EN HUANG and LISA LEE laundered approximately $250,000 cash by having a courier carry it from San Francisco to Amsterdam to purchase MDMA;

(b) Section V will show that in the late summer and fall of 2002, MAI, assisted by ZHI EN HUANG and KAI LUN ZHENG, sold and delivered approximately 50 kilograms (200,000 pills) of MDMA to distributors in the Los Angles area;

8

(c) Section VI will show that from mid-2002 to early 2003, MAI, ERIC CAI and KAI LUN ZHENG sold approximately 42.5 kilograms (170,000 pills) of MDMA to distributors in the Houston area;

(d) Section VII will show that in April 2001 MAI and LISA LEE used over $409,000 in drug proceeds laundered through Hong Kong and US bank accounts to purchase a home in Oakland in the name of MAI's mother;

(e) Section VIII will show that in September 2002 KAI LUN ZHENG used $500,000 in drug proceeds laundered through Hong Kong bank accounts to purchase a home in Oakland; and that from 2001 to early 2003 KAI ZHENG laundered approximately $226,000 in drug proceeds through a US bank account and business;

(f) Section IX will show that following the murder of Jingsan Li in September 2002 and flight of KAI ZHENG to Canada in April 2003, MAI, assisted by ERIC CAI, ZHI EN HUANG, and DAVID YUEN, sold approximately an additional 207.5 kilograms (830,000 pills) of MDMA to distributors in the Houston area between Spring 2003 and October 2004;

(g) Section X will show that in August 2003 MAI and LISA LEE used $250,000 in drug proceeds laundered through Hong Kong bank accounts to pay off their Oakland home; that in December 2003, MAI and LISA LEE used approximately $1,290,000 in drug proceeds laundered through Hong Kong bank accounts to purchase a new home in Hillsborough, California;

(h) Section XI will show that in December 2002 ERIC CAI used $335,000 in drug and illegal gambling proceeds laundered through US and Hong Kong bank accounts to purchase a home in Burlingame, California; and that from December 2002 to July 2005 ERIC CAI laundered at least $206,000 in drug and illegal gambling proceeds through the accounts of his father and sister in order to pay down the loans used to purchase his home.

9

## II. BACKGROUND OF COOPERATING DEFENDANTS AND INFORMANTS IN THIS CASE

2. The following cooperating defendants and informants have provided information used in this affidavit:

(a) In April 2006, DEA and ICE agents interviewed a cooperating defendant (hereinafter known as CD-1), who provided information about his knowledge of and involvement with the MAI MDMA trafficking organization from 2000 to 2005. CD-1 has been charged federally with possession of MDMA with Intent to Distribute and Conspiracy to Distribute MDMA. CD-1 has decided to plead guilty and cooperate with the United States government in order to receive consideration at sentencing. CD-1 has consistently provided reliable information to his DEA handlers.

(b) In September 2005, Special Agents from the California Bureau of Narcotics Enforcement (BNE) and ICE interviewed a BNE confidential informant (hereinafter, CI-2) concerning his involvement with the MDMA trafficking organization headed by MAI in the spring of 2001. CI-2 agreed to cooperate following his apprehension in possession of several thousand MDMA pills. CI-2 has not been charged for that offense. BNE has verified that CI-2 has provided accurate information for nearly three years.

(c) In March 2005, ICE agents interviewed a confidential informant (hereinafter referred to as CI-3), who is closely related to murder victim Jingsan "Johnny" Li and has never been involved in criminal activity. CI-3 has knowledge of the MAI organization in 2002.

(d) In April 2004, ICE agents interviewed a cooperating defendant (hereinafter referred to as CD-4), who had been arrested for MDMA trafficking and received consideration for his cooperation during

10

sentencing. CD-4 has previously provided accurate information to the DEA. CD-4 was involved in drug trafficking with the MAI organization in 2001 and 2002.

(e) In July of 2005, DEA and ICE agents interviewed a cooperating defendant (hereinafter referred to as CD-5), who was charged in March 2004 with operating a Continuing Criminal Enterprise related to MDMA trafficking, and has decided to plead guilty and cooperate in return for consideration during sentencing.   CD-5 was involved in MDMA trafficking with the MAI organization in 2002, and has consistently provided accurate information to the FBI and DEA.

(f) In September of 2005, ICE and DEA agents interviewed a cooperating defendant (hereinafter referred to as CD-6), who was charged in March of 2004 with operating a Continuing Criminal Enterprise and has agreed to plead guilty and cooperate in return for consideration at sentencing. CD-6 has provided accurate information to the DEA. CD-6 was involved in MDMA trafficking with the MAI organization in 2002.

(h) In August 2004, DEA agents interviewed a cooperating defendant (hereinafter CD-7), who was charged in March of 2004 with operating a Continuing Criminal Enterprise and has agreed to plead guilty and cooperate in return for consideration at sentencing.   CD-7 has consistently provided accurate information to the DEA.   CD-7 was involved in MDMA trafficking with the MAI organization in 2003 and 2004.

(i) In September 2004, DEA and ICE agents interviewed a confidential informant (hereinafter referred to as CI-8), who possesses historical information about the JOHNSON MAI organization from 2001 through 2004.   CI-8 has a prior arrest for fraud in connection with credit cards.   Charges for this offense were dropped due to CI-8's

11

cooperation with law enforcement. CI-8 has no felony convictions. According to CI-8's handlers, CI-8 has provided investigators with reliable and accurate information.

(j) In December 2004, DEA agents interviewed a confidential informant (hereinafter referred to as CI-9), who is familiar with the MDMA trafficking activities of the MAI organization in 2004. CI-9 has a prior felony conviction for fraud in connection with credit cards. DEA arrested CI-9 in possession of approximately 2000 MDMA tablets, and CI-9 has agreed to cooperate in return for consideration for that offense. According to CI-9's handlers, CI-9 has thus far provided investigators with reliable and accurate information.

(k) In December 2004, DEA agents interviewed a cooperating defendant (hereinafter referred to as CD-10), who is familiar with the MDMA trafficking activities of the MAI organization from 2001 to 2004. CD-10 has no prior felony conviction, but has an outstanding Canadian warrant for drug trafficking. CD-10 has been charged federally for distribution of MDMA, and is working toward consideration at sentencing. According to CD-10's handlers, CD-10 has thus far provided investigators with reliable and accurate information.

(l) In December 2005, DEA agents interviewed a confidential informant (hereinafter referred to as CI-11), who has not been charged with a crime but has agreed to cooperate with federal law enforcement. CI-11 was involved in money laundering with ERIC CAI in 2004. CI-11 has consistently provided accurate information to the DEA.

(m) In May 2006, ICE agents interviewed a confidential informant (hereinafter referred to as CI-12), who has no criminal history and has not been charged with an offense. CI-12 has knowledge of the money laundering activities of ERIC CAI from 2002 to 2004.

12

## III. CRIMINAL BACKGROUND OF JOHNSON MAI

3. Records from the Royal Canadian Mounted Police show that on February 15, 1991, JOHNSON MAI, using the alias of CHI HUNG MAK, was arrested by the Vancouver (British Columbia) Police Department for counterfeit credit card trafficking. The records also show that on May 10, 1991, the Delta (British Columbia) Police Department arrested MAI, who again used the alias of CHI HUNG MAK, for counterfeit credit card trafficking. I am familiar with the appearance of JOHNSON MAI and have examined the 1991 Canadian booking photographs and found them to be photographs of JOHNSON MAI. Additionally, CHI HUNG MAK is the Cantonese version of the Mandarin name ZHI XIONG MAI, MAI's legal name before he changed it to JOHNSON MAI upon acquiring US citizenship in 2001.

4. Records from the Australian Joint Asian Crime Group (JACG) show that in September 1998, the JACG began an investigation of JOHNSON MAI (ZHI XIONG MAI) and his wife, LISA LEE (XIAO LING LI), US residents visiting Australia at that time. During this trip to Australia, MAI and LEE remitted large sums of money to Hong Kong while staying for about one month at the Sydney Casino in Sydney, Australia.    During their stay, MAI and LEE provided telephone number (510) 835-9309 as their home telephone number in Oakland, California (see paragraph 5 below). On April 1, 1999, MAI again traveled to Australia, arriving at the Sydney International Airport with an individual named Po Man Li. Australian Customs conducted a secondary inspection on both subjects and arrested both of them, after finding MAI to be in possession of a stolen Belgian passport and Po Man Li with thirteen counterfeit credit cards. MAI paid a $500 fine for his possession of the stolen passport.

13

Po Man Li received a nine-month sentence of imprisonment for credit card fraud. During this visit to Australia, MAI deposited $248,600 into accounts at the Star City and Crown Casinos in Sydney. He departed Australia on May 4, 1999 and arrived at San Francisco International Airport on that same date.

5. Records from the JACG also show that on November 21, 2000, Australian Customs seized 79 kilograms of crystal methamphetamine concealed inside a shipping container at the Port of Sydney, Australia. On December 2, 2000, Australian Customs seized 184 kilograms of heroin concealed inside another shipping container at the Port of Sydney. Both containers originated with the same shipper in Hong Kong. In connection with these seizures, the JACG arrested Michael Lee, an Australian resident. Following his arrest, Lee told Australian law enforcement officers that he had been instructed by his boss, "AH HONG," to retrieve a portion of the crystal methamphetamine. Lee said that "AH HONG" used the surname "MAI" and resided in the United States. At the time of his arrest, Lee had three telephone numbers in his possession for "AH HONG." Two of the numbers were San Francisco Bay Area land lines. One of them was (510) 835-9309, the same telephone number that MAI had provided to the Sydney Casino in September 1998 for his residence (see paragraph 4 above and 7 below). The third telephone number that Lee provided for "AH HONG" was (31)613078979, a Dutch cellular telephone number (see paragraph 12 below).

6. On December 11, 2000, under the supervision of the JACG, Lee placed a call to "AH HONG" at (31)613078979. During that call, "AH HONG" instructed Lee to deliver a portion of the crystal methamphetamine to an unidentified female at the Star City Casino in

14

Sydney, Australia.  Later that day, Lee met the female, subsequently

identified by JACG as Wen Ying Zheng, who became suspicious and refused

to take delivery of the crystal methamphetamine.  According to JACG,

Zheng had an estimated annual gambling turnover of approximately

twenty-one million dollars at the Sydney Casino and had previously

remitted money to Zhi Min Mai, MAI's sister (see paragraph 7 below).

Shortly after the attempted drug delivery to Zheng, Lee tried

unsuccessfully to contact "AH HONG" on his Dutch mobile telephone.

Zheng told Lee that "AH HONG's" mobile telephone had been disconnected.

Zheng refused to provide any additional numbers for "AH HONG."  U.S.

Customs records show that JOHNSON MAI arrived at the San Francisco

International Airport from Amsterdam, Netherlands, on December 19,

2000, approximately one week after the failed delivery of the crystal

methamphetamine.

    7. AT&T records show that telephone number (510) 835-9309

is a land line, active since October 1, 1992, subscribed to by Rong An

Li at 823 East 24th Street in Oakland, California.  U.S. immigration

records list Rong An Li at 823 East 24th Street as the father of LISA

LEE.  In addition, the California driver's licenses for MAI and LEE

display the 823 East 24th Street address as their residence. I have

also reviewed the United States Immigration file of JOHNSON MAI.

According to paperwork completed by MAI in that file, Zhi Min Mai (see

paragraph 6 above) resides in Australia and is JOHNSON MAI's sister.

The file also confirms that LISA LEE is the wife of JOHNSON MAI and

lists their address as 823 East 24th Street, Oakland.

\

15

**IV. INVOLVEMENT OF JOHNSON MAI, LISA LEE, ERIC CAI, ZHI EN HUANG, AND KAI LUN ZHENG IN THE CONSPIRACY TO DISTRIBUTE MDMA: 2001-2002 IMPORTATION OF TRANSMISSIONS, PIANOS, SOFAS**

8.    This section sets out evidence of the involvement of MAI, LISA LEE, ERIC CAI, ZHI EN HUANG, KAI LUN ZHENG, and Jingsan Li (deceased) in the first phase of the conspiracy to distribute MDMA: the importation of transmissions, pianos, and sofas from Europe to San Francisco in 2001 and 2002.  This section details the following:

(a) information about the overall conspiracy provided by CD-1 (paragraph 9);

(b) the specific involvement of CI-2 in the conspiracy in the spring of 2001 (paragraph 10);

(c) corroborative US Customs records (paragraph 11);

(d) corroborating information obtained by the Belgian Federal Police investigation (paragraph 12);

(e) the corroborative US Customs investigation of transmission, piano, and sofa importations (paragraph 13);

(f) corroborative observations by agents at 823 East 24th Street in Oakland (paragraph 14);

(g) seized documents linking KAI ZHENG directly to the importations (paragraph 15);

(h) documents seized from KAI ZHENG's mail drop linking him to the importations (paragraph 16);

(i) phone toll and documents linking KAI ZHENG directly to the importations (paragraph 17);

(j) evidence seized from ZHENG's house linking him to MAI and LISA LEE (paragraph 18);

(k) information provided by CI-3 of the association of MAI, ZHENG, and HUANG (paragraph 19);

16

(1) the specific involvement of CD-4 in the conspiracy to
distribute MDMA in 2001 (paragraph 20).

Additionally, the movement of large amounts of money by MAI, LISA LEE,
and KAI ZHENG during this time frame is detailed in Sections VII, VIII,
and X.

9.  CD-1 provided the following information regarding the
conspiracy to distribute MDMA:

(a) In the 1990s, ERIC CAI introduced CD-1 to JOHNSON MAI ("UNCLE
HONG"), KAI LUN ZHENG ("SU MING"), and Jingsan ("Johnny") Li in San
Francisco.  In about 2000, CAI informed CD-1 that MAI was involved in
the smuggling of large amounts of ecstasy (MDMA) into the United States
and needed distributors to sell it.  CAI asked CD-1 to distribute an
undisclosed amount of ecstasy for MAI.  CD-1 declined, but CAI
continued to inform CD-1 about MAI's MDMA trafficking organization over
the next five years. Also during this time, CD-1 met periodically with
MAI and his primary MDMA distributors, which enabled CD-1 to learn the
details about how MAI's MDMA trafficking organization operated.

(b) In 2000, CAI informed CD-1 that he had connected MAI with
ZHENG and Li, who were distributing large amounts of ecstasy for MAI.
Over the next several years, CAI informed CD-1 that MAI had made
millions of dollars smuggling ecstasy pills into the United States from
Amsterdam concealed inside car transmissions and pianos.  Initially,
MAI's source of supply in Amsterdam had shipped the MDMA to him inside
of car transmissions.  However, another Dutch group competing with
MAI's suppliers had actually covertly installed a camera inside the
warehouse used my MAI's suppliers and discovered their smuggling
method.  The competing group then imitated MAI's suppliers by sending
their MDMA shipments inside of car transmissions.  However, their first

17

shipment, unrelated to MAI's suppliers or his organization, was seized by law enforcement (See paragraph 12 below). Following this seizure, MAI's suppliers switched their smuggling method to pianos.   Later, MAI began importing MDMA powder directly and pressing it into pills locally.

(c) CAI informed CD-1 that at some point federal agents had gone to MAI's in-laws home to questions MAI's sister-in-law regarding her possession of a large amount of cash in Hong Kong.  During this interview, the agents noticed one of the pianos used to smuggle MDMA in the living room and examined it closely (see Paragraph 14 below).

(d) CAI told CD-1 that ZHENG and Li distributed the ecstasy for MAI once it arrived in San Francisco, and that they had the capacity to distribute up 200,000 MDMA tablets per week.  One of ZHENG's chief subordinates in the MDMA distribution network was DAVID YUEN of Oakland, whom CD-1 met on several occasions.  In return for CAI finding distributors for his ecstasy, MAI allowed CAI to borrow from the vast amount of cash realized from MAI's drug smuggling operation, thus enabling CAI to greatly expand his bookmaking operation by increasing the number of bets he could cover on any given Sunday.  As a result of MAI's backing, CAI was able to take in an average of $30,000 in bets per game per Sunday during football season (for a total of over $400,000 per week).

(e) CD-1 met MAI on several occasions, including at his home in Oakland.  During one of these meetings, MAI told CD-1 that he had made so much money selling MDMA that he didn't know how to spend it all.

10. CI-2 provided the following information regarding his involvement in the conspiracy:

18

(a) In the spring of 2001, CI-2 acted as a money courier for ZHI EN HUANG (whom CI-2 identified by photo), whom he knew as "GAO LO" ("Tall Man"). On one occasion in April of 2001, at HUANG gave CI-2 approximately $250,000 cash and a plane ticket to Amsterdam with instructions to deliver the cash to an unknown party for the purchase of ecstasy. Once in Amsterdam, CI-2 met with LISA LEE (also identified by CI-2 by photo) and gave the money to her. CI-2 and LEE then met with Lai Fat Fung (later arrested in Belgium for smuggling ecstasy in BMW transmissions, see paragraph 12 below, identified by CI-2 by photo), who provided samples of ecstasy pills to both of them. CI-2 understood that LEE had given the cash to Fung as payment for ecstasy either that was to be shipped or already had been shipped to San Francisco. Afterwards, CI-2 and LISA LEE returned to the United States together with the ecstasy samples.

(b) A few weeks after CI-2's return to the United States, CI-2 assisted HUANG and others in unloading garbage bags filled with ecstasy pills concealed inside three BMW transmissions that had recently arrived from Europe. A few weeks after this incident, CI-2 once again helped HUANG unload ecstasy from another shipment of 3 BMW transmissions. CI-2 estimated that each transmission contained tens of thousands of ecstasy pills.

11. US Customs records show that on April 20, 2001, LISA LEE and CI-2 arrived at San Francisco International Airport from Amsterdam aboard KLM Flight 605. Additionally, Customs records show that on February 18, 2001, KAI LUN ZHENG returned to the United States at San Francisco International Airport from Amsterdam, Netherlands. In addition to MAI's December 2000 trip to Amsterdam (see paragraph 6), US

19

Customs records show that MAI returned to San Francisco from Amsterdam

on January 21, 2002, and from an unknown foreign location on June 25,

2001.

      12. On September 18, 2001, the Belgian Federal Police (BFP)

arrested Lai Fat Fung (see paragraph 10 above) and his partner Chi Yong

Chan for MDMA smuggling, including the shipment of over 8 kilograms of

MDMA tablets seized from inside a BMW transmission that had been

shipped from Belgium to New Zealand in January 2001, as well another 8

kilograms of MDMA tablets seized inside a BMW transmission bound for

Los Angeles from Belgium in May 2001.  At the same time, the BFP

executed a search warrant at the residence of Chi Yong Chan in Antwerp,

Belgium.  During the execution of the search warrant, the BFP found

several Belgian and Dutch mobile telephone numbers with a Chinese

character written beside them.  The Chinese character, when translated

in the Mandarin dialect, appears as "Xiong."  When translated in the

Cantonese dialect, the characters translate to "HONG."  One of the

Dutch numbers was 613078979, the same number that Michael Lee gave to

Australian authorities in December 2000 as a contact number for "HONG"

(i.e., MAI, see paragraph 5 above).

      13. Also during the search, the BFP found shipping documents for

an upright Euterpe piano destined to arrive in San Francisco from

Germany on the following day.  On September 21, 2001, U.S. Customs at

San Francisco International Airport inspected the piano and discovered

40.5 kilograms of MDMA concealed inside of it.  Following this seizure,

US Customs agents in San Francisco identified additional shipments of

BMW transmissions, pianos, and sofas that had been imported via air

cargo into San Francisco Airport but had not been inspected by US

Customs. Some of these shipments had been identified by the Belgian

Federal Police investigation as shipments sent by the organization

under investigation in Belgium and the Netherlands but never inspected.

Others were identified by US Customs agents in San Francisco as

possessing all of the characteristics of the shipments that had been

seized with MDMA inside, i.e., the actual importers (i) used stolen

identities for all paperwork filed in connection with the importation,

(ii) used prepaid cell phones obtained with false identities as the

contact number for the shipment, and (iii) hired truck drivers to pick

up the shipments and deliver them to public locations, where the items

would be picked up by unidentified individuals. Based on the

similarities with the seized shipments, I believe each of these

shipments, which cleared US Customs without inspection, contained

between 16 and 120 kilograms of MDMA. The shipments identified as a

result of this investigation were as follows:

        (a) On January 10, 2001, two BMW transmissions arrived at San

Francisco Airport via DHL Air Cargo from Belgium. The shipment was

consigned to Jing Jun Li of San Francisco with a contact number of 510-

318-1247. US Customs agents interviewed Jing Jun Li and determined

that he had never ordered the transmissions, and had been a victim of

identity theft.

        (b) On March 2 and 28, 2001, two shipments of three BMW

transmissions each (for a total of six transmissions) arrived at San

Francisco Airport via DHL Air Cargo from Germany. The shipments were

consigned to Iat Hao Chio of San Francisco with a contact number of

510-761-1203. The shipment was picked up from DHL and delivered to the

parking lot of a Chinese restaurant in Oakland, Chinatown, where

unidentified individuals paid for the shipment in cash and took

possession of it. US Customs agents interviewed Iat Hao Chio and

21

determined that he had never ordered the transmissions, and had been a victim of identity theft.

(c) On April 4, 2001, a shipment of thee BMW transmissions arrived at San Francisco Airport via DHL Air Cargo from Germany. The shipment was consigned to Min Jie Lee with a contact number of 415-238-1741. The shipment was picked up from DHL and delivered to the parking lot in Oakland Chinatown, where unidentified individuals paid for the shipment in cash and took possession of it. US Customs agents interviewed Min Jie Lee and determined that she had never ordered the shipment and had been a victim of identity theft.

(d) On June 26 and July 9, 2001, two shipments of four Schimmel pianos (one and three pianos, respectively) arrived at San Francisco Airport via Cargolux and Lufthansa from Germany. The shipments were consigned to Ui Cho with a contact number of 415-672-7195. The shipments were picked up from Cargolux and Lufthansa and delivered to public locations in Oakland Chinatown and San Leandro, where unknown persons took possession of the shipments and paid for them in cash. US Customs agents interviewed Ui Cho and determined that she had never ordered the pianos and had been a victim of identity theft.

(e) On August 18 and 30, 2001, two shipments of four Euterpe pianos (two and two pianos, respectively) arrived at San Francisco Airport via Cargolux from Germany. The shipments were consigned to Ju Lie Vo with contact numbers of 510-761-1295 (first shipment) and 510-761-5222 (second shipment). The shipments were picked up from Cargolux and delivered to the parking lot of the East Ocean Restaurant in Emeryville, California, where unknown persons took possession of the shipments and paid for them in cash. US Customs agents interviewed Ju Lie Vo and determined that she had never ordered the pianos and had been a victim of identity theft.

22

(f) On March 14 and June 7, 2002, two shipment of five leather sofas (one and four sofas, respectively) arrived at San Francisco Airport via United Airlines and Air France from France. The shipments were consigned to Teng Wei Li of Hillsborough, California with a contact number of 415-713-6809. The shipments were picked up and delivered to unknown individuals. US Customs agents conducted interviews and determined that Teng Wei Li had never ordered the sofas and had been a victim of identity theft. In July 2002, Canadian Customs officers seized a similar leather sofa at Calgary International Airport and found approximately 34 kilograms of MDMA concealed inside the sofa.

14. In June and August of 2004, ICE and IRS Special Agents interviewed Sui Ming Li at 823 East 24th Street, Apartment 1, Oakland. When shown a photograph of JOHNSON MAI, both Sui Ming Li and her father Rong An Li, denied knowing MAI, despite the fact he had been Sui Ming Li's brother-in-law and Rong An Li's son-in-law for over ten years. During the interview agents noticed that the one of the three rooms in the apartment contained an upright Schimmel piano, identical to the kind imported in June and July of 2001 and believed to have contained MDMA (see paragraph 13d above). This incident was repeated to CD-1, see paragraph 9c above.

15. In September of 2002, Jing San "Johnny" Li (previously identified by CD-1 as a distributor for MAI, see paragraph 8 above), his girlfriend Deborah Yao, and Kevin Kwok were found murdered in a residence in Union City, California. An upright Euterpe piano with a serial number matching the one imported in the August 19, 2001 shipment (see paragraph 13e above) was found at the murder scene. Subsequent

23

investigation by the Union City Police Department showed that Johnny Li
and Kwok had been heavily involved in ecstasy trafficking.    At the
time of the discovery of the victims, Union City Police questioned an
KAI LUN ZHENG, who had been at the murder scene prior to the arrival of
the police.    In April 2003, Union City Police Department and South
Alameda County Narcotics Enforcement Team officers executed two state
search warrants at the residence of KAI ZHENG, located at 12645 Skyline
Drive, Oakland, as part of an investigation of that triple homicide.
FBI criminal history records show that in 1993 ZHENG had been twice
arrested under the name "WAI KEUNG CHEUNG" for credit card fraud, and
that an outstanding warrant exists for him under that name in San
Francisco.    Furthermore, Immigration records show that the INS
initiated deportation proceedings against ZHENG under his alias, but
that he failed to appear for the hearing.    Canadian criminal history
records also show that ZHENG was arrested for heroin trafficking in
Vancouver, British Columbia in 1992.    During the search of ZHENG's
house, officers discovered approximately 88 grams of MDMA pills, a
Heckler and Koch handgun, blank credit cards and equipment associated
with the manufacture of counterfeit credit cards, two electronic
scales, $173,000 cash in two safe deposit boxes, and the following
documents linking KAI ZHENG to the transmission, piano, and sofa
importations believed to contain MDMA:

(a) a cellular telephone agreement in the name of Jing Jun Li
(the consignee for the January 10th BMW transmission shipment, see
paragraph 13a above);

(b) a counterfeit California driver's license in the name of
Nathen Chang but bearing the photograph of KAI LUN ZHENG (see below for
link to MDMA shipments);

24

(c) a Customs Power of Attorney in the name of Teng Wei Li that had been faxed to the Customs broker who had handled the importation of the June 2002 sofa shipment (Teng Wei Li was the consignee for this shipment and the March sofa shipment, see paragraph 13f);

(d) a cellular phone service agreement in the name of Iat Hao Chio (the consignee for the March 2 and 28, 2001 BMW transmission shipments, see paragraph 13b above), for phone number 415-706-7041 with a billing address of 298 4th Avenue, No. 325, San Francisco (see paragraph 16 below);

(e) documentation regarding Zheng's false identity in the name of Leo Young, the subscriber for the cellular phone contact number given to the truck drivers who picked by the March 2, March 29, and April 4, 2001 shipments of BMW transmissions (see paragraphs 13b and c above);

(f) Court documents from federal district court in Arizona for the federal prosecution of Hai Ming Mu, who had been arrested on August 29, 2002, in possession of 60,000 MDMA tablets and a counterfeit drivers license in the name of Teng Wei Li, the same stolen identity used to import shipments of sofas containing MDMA in March and June of 2002. CD-1 has identified Hai Ming Mu as an MDMA courier for KAI ZHENG, who had made previous deliveries of MDMA from San Francisco to Houston.

KAI ZHENG was not present during the execution of the search warrants, and was stopped by Canadian Customs officials two days prior to the search at the Niagara Falls Port of Entry as he crossed into Canada with his wife and child. Canadian Customs officials found and seized $21,500 cash concealed in baby diapers as well as a check for $78,000, but ZHENG was allowed to proceed into Canada. The Alameda County District Attorney's Office later charged ZHENG criminally for

25

possession of the 88 grams of ecstasy found at his residence.  A
federal grand jury in the Northern District of California also indicted
ZHENG for immigration fraud in March of 2004.  ZHENG is presently a
fugitive.

16. On July 24, 2003, ICE served a subpoena for Mail Box Number
325 at 298 4th Avenue, San Francisco.  The application for this mail
drop had a photocopy of a California driver's license (later determined
to be counterfeit) in the name of Leo Young but bearing the photograph
of KAI LUN ZHENG.  The mail for that box contained envelopes addressed
to Nathen Chang (see paragraph 15b above) and to Iat Hao Chio (see
paragraphs 13b and 15d).

17. Analysis of cellular phone subscriber and toll information,
as well as documents found during the search of ZHENG's house and mail
drop, links KAI ZHENG, through his aliases, including the false
identities of Nathen Chang and Leo Young, to the BMW transmission,
piano, and sofa shipments listed in paragraph 13 above.

(a) In addition to the documents related to the stolen identity
of Jing Jun Li, consignee for the January 10, 2001 shipment of BMW
transmissions, found at KAI ZHENG's house, the cellular phone records
for cell phone 510-289-6155, in the name of Leo Young (ZHENG's alias,
see paragraph 21 above), show that Young's phone called the contact
number for the January 10, 2001 shipment (510-318-1247) six times in
January 2001, and called DHL (the shipper for the January 10th shipment)
five times in January 2001.  Additionally, the billing address for the
Leo Young cell phone was on Midvale Street in Oakland, the street on
which KAI ZHENG lived in 2000 (see paragraph 20 below).

26

(b) In addition to documents related to the stolen identity of Iat Hao Chio, consignee for the March 2 and 28, 2001 shipment of BMW transmissions, found at KAI ZHENG's house, various cellular phone records also connect ZHENG to these shipments. The Leo Young cell phone (510-289-6155, see paragraph 17a above) made 38 calls to Oriox, the Customs broker for these shipments as well as for the April 4, 2001 shipment of BMW transmissions, in March and April of 2001, as well as 22 calls to Can Pei Zhang, the truck driver used to pick up these shipments and the April 4th shipment, in March and April of 2001. Furthermore, the contact number for the shipment (510-761-1203), was subscribed to at the same Midvale Street address in Oakland as the Leo Young cell phone.

(c) The Customs Powers of Attorney for the June 26 and July 9, 2001 Schimmel piano shipments list Nathen Cheng (a ZHENG alias, see above) and Danny Li as witnesses. Records for cellular phone 510-761-1295 list Danny Li as the subscriber, with an address of 298 4th Avenue, San Francisco (the KAI ZHENG mail drop, see paragraph 16 above). This cell phone calso shows calls to Dynasty, the Customs broker for the July 9th shipment, on the day of its arrival, and calls to Can Pei ZHENG, the truck driver who picked up this shipment, at the time of its arrival and delivery. Furthermore, another cellular phone, 510-846-7102, subscribed to in the ZHENG alias of Nathen Chang (see above) also shows calls to the truck driver Can Pei ZHENG at the time of the July 9th shipment's arrival and delivery.

(d) The Danny Li cell phone (510-761-1295, see above) subscribed to at the KAI ZHENG mail drop also appears on importation documents as the contact number for the August 18, 2001 shipment of two pianos (see paragraph above). This cell phone also called Dynasty, the Customs broker who handled this shipment, 13 times during the time of the

27

shipment's arrival and delivery. Furthermore, a second cell phone, 510-761-8893, prepaid and with no subscriber, was provided to Kwang Lau, the truck driver who picked up the August 30, 2001 piano shipment. This cell phone has 33 calls to the cell phone obtained in Iat Hao Chio's stolen identity (see paragraph 15d above) during this time frame.

(e) The contact number on documents for the importation of the five sofas in the March 14 and June 7, 2002 shipments (see paragraph 13f above) is 415-713-6809. This number was subscribed to in the ZHENG alias of Nathen Chang at 298 4th Avenue, No. 325, San Francisco, ZHENG's mail drop. This number also appeared as the contact number on the Customs Power of Attorney in Teng Wei Li's name found at ZHENG's residence (see paragraph 15c above).

(f) According to the investigation of the Belgian Federal Police, the MDMA from the shipments detailed above originated in the Netherlands. The home phone toll records for KAI ZHENG's residence also shows six calls to the Netherlands in July of 2002.

18. During the April 2003 search of ZHENG's residence, officers also found evidence linking ZHENG to JOHNSON MAI and LISA LEE. For example, the electronic directory of ZHENG's cellular telephone (510-847-2009) listed (510) 847-3627 with the name "HONG" adjacent to the number. The cellular telephone's record of recent calls showed that seven of ZHENG's last ten calls were to or from (510) 847-3627. Since November of 2001, LISA LEE at 823 East 24th Street, Oakland has subscribed to (510) 847-3627. Officers also found a travel itinerary at the residence that showed confirmed reservations for travel on Southwest Airlines Flight 1544 to Las Vegas on July 10, 2001 for KAI ZHENG, Ada Zheng (KAI ZHENG's wife), and ZHI XIONG (JOHNSON) MAI. In

28

addition, officers found a contract with the company "US Alarm," dated December 21, 2002, for a residential burglar alarm. The contract listed "LISA LEE," with a telephone number of (510) 381-8340, as a contact. This telephone number was subscribed to by (LISA) XIAO LING LI at 5019 Crystal Ridge, Oakland, California (MAI's and LEE's residence at the time).

19. CI-3 has identified photos of MAI, ZHENG, LISA LEE, and ZHI EN HUANG ("GAO LO") as close associates of Johnny Li. Specifically, in the summer of 2002, CI-3 met MAI and LISA LEE while they were vacationing at Lake Tahoe together with ZHENG and Johnny Li. At approximately this time, CI-3 observed three black upright pianos in Johnny Li's garage. Following Li's murder, CI-3 saw MAI and ZHENG search Li's residence.

20. CD-4 has stated that Johnny Li and KAI ZHENG were his sources of supply for MDMA. In 2001 he would pick up anywhere from 10,000 to 50,000 ecstasy pills from Johnny Li and KAI ZHENG, who lived together in a house on Midvale Avenue in Oakland, every one or two weeks. On one occasion Li handed CD-4 a grease-covered leaded bag containing 50,000-75,000 ecstasy pills that Li said had come from a BMW transmission imported from Europe. Li told CD-4 that he and ZHENG got their MDMA from an unidentified individual in the Bay area who had the connections in Amsterdam, and smuggled the MDMA into the United States inside of BMW transmissions.

## V. INVOLVEMENT OF MAI, ZHI EN HUANG, AND KAI LUN ZHENG IN CONSPIRACY TO DISTRIBUTE MDMA: 2002 DISTRIBUTION IN LOS ANGELES

21. Following the July 2002 seizure in Canada of 34 kilograms of MDMA in a leather sofa (see paragraph 13f), the MAI organization did not import any further sofas into San Francisco Airport. This section sets out evidence of the involvement of MAI, ZHI EN HUANG, and KAI LUN ZHENG in the second phase of the conspiracy to distribute MDMA: the sale to distributors in Los Angeles of approximately 50 kilograms (200,000 pills) of MDMA in the late summer and fall of 2002. This section details the following:

(a) the involvement of CD-5 in the distribution of the 200,000 pills of MDMA (paragraph 22);

(b) the involvement of CD-6 in the distribution of the 200,000 pills of MDMA (paragraph 23);

(c) corroborative US Customs records (paragraph 24).

Additionally, the movement of large amounts of money by MAI, LISA LEE, KAI ZHENG during this time frame are detailed in Sections VII, VIII, and X.

22. CD-5 provided the following information regarding his involvement with the MAI organization:

(a) CD-5 identified MAI as the head of a large-scale MDMA smuggling and distribution organization that smuggled MDMA from the Netherlands into Canada and the United States. CD-5 identified LISA LEE, KAI LUN ZHENG, DAVID YUEN, and ZHI EN HUANG by photograph as MAI's associates in this criminal enterprise. CD-5 had known MAI as CHI HUNG MAK since the early 1990s, and was aware that MAI had fled Canada following the issuance of an arrest warrant for MAI for credit card

30

fraud. At this time, CD-5 also knew KAI ZHENG as "SU MING", a counterfeit credit card trafficker in Canada. In 2000, CD-5 met MAI and ZHENG again in New York and renewed his relationship with both of them.

(b) In March or April of 2002, during a meeting in Toronto, Canada, MAI told CD-5 that he had large amounts of MDMA available if CD-5 could find buyers. CD-5 agreed to look for buyers for MAI. In late July of 2002, CD-5 notified MAI that he had found a buyer for his ecstasy in the Los Angeles area. Between August 1, 2002 and October 2002, CD-5 arranged for the distribution of approximately 200,000 MDMA pills from MAI. During this time, ZHI EN HUANG delivered approximately 40,000 pills to CD-5 in Los Angeles on five or six occasions. HUANG would drive a vehicle containing the ecstasy from the San Francisco Bay Area to the Los Angeles area. CD-5 would collect the money from his distributors and then deliver it to HUANG, who would in turn deliver it to MAI. During this time, CD-5 stayed at MAI's residence in the Oakland hills (5019 Crystal Ridge, Oakland) and had numerous conversations with MAI about his MDMA trafficking business. MAI told CD-5 that he obtained the MDMA from the Netherlands and boasted that no other MDMA trafficker in Canada or the United States could compete with him. MAI also told CD-5 that KAI LUN ZHENG, Johnny Li, and DAVID YUEN were his primary distributors. CD-5 also heard conversations between MAI and YUEN about YUEN finding couriers to carry the cash that MAI made from MDMA trafficking to Hong Kong for laundering. Additionally, CD-5 observed that MAI kept samples of MDMA over the mantle of his fireplace, and often showed the samples to CD-5 in LISA LEE's presence. CD-5 also observed that MAI had pictures of his MDMA samples on his home computer.

31

(c) Following the murder of Johnny Li in September 2002 (see paragraph 15 above), MAI informed CD-5 that he had temporarily run out of MDMA, but asked CD-5 to stay as he was expecting a 2,000,000 pill shipment in the near future. CD-5 declined to stay and returned to Canada. In November or December of 2002, MAI traveled to Toronto and met with CD-5. MAI informed CD-5 that he had received a 190 kilogram shipment of MDMA powder in Toronto, and that he needed drivers to transport it to Vancouver, where it would then be trucked across to San Francisco. CD-5 eventually purchased ten kilograms of that powder from MAI for approximately $20,000 per kilogram. MAI later told CD-5 that he had sold another 10 kilograms of the powder in Toronto and then arranged for the rest to be transported to Vancouver and eventually to the United States.

(d) In the spring of 2003, CD-5 met with KAI LUN ZHENG in Toronto. ZHENG indicated to CD-5 that he had left the United States due to trouble there, including the arrest of his wife. ZHENG told CD-5 that DAVID YUEN had become MAI's primary distributor of MDMA in the San Francisco Bay Area. According to CD-5, MAI was known by the nickname of "UNCLE HONG."

23. CD-6 has provided information corroborating CD-5's statements. CD-6 confirmed that in mid-2002 CD-5 agreed to supply 200,000 pills of MDMA to CD-6's connections in the Los Angeles area in four 50,000 pill shipments. CD-6 identified a photograph of JOHNSON MAI as the individual whom CD-5, in November or December of 2002 in Toronto, introduced to CD-6 as CD-5's source of supply for the ecstasy shipments. CD-6 and MAI negotiated for further large shipments of ecstasy but were unable to come to agreement on a price.

32

24. US Customs records show that on March 17, 2002, MAI departed
San Francisco for Toronto, Canada, and that on March 19, 2002 MAI
arrived at San Francisco Airport from Toronto.  Those records also show
that on January 21, 2002, MAI arrived in San Francisco from Amsterdam.
US Customs records also show that on November 14 and December 5, 2002,
MAI arrived at San Francisco International Airport from Vancouver,
Canada, and on December 11, 2002 arrived at SFO from Toronto Canada.
Customs records also show that on September 9, 2002, MAI arrived at SFO
from Amsterdam, Netherlands.

## VI.  INVOLVEMENT OF MAI, ERIC CAI, AND KAI LUN ZHENG IN THE CONSPIRACY TO DISTRIBUTE MDMA:   2002-2003 DISTRIBUTION TO HOUSTON

25. In mid-2002, after CD-1 learned about the immense profits
that KAI ZHENG and Johnny Li were making by distributing MDMA for MAI,
CD-1 asked CAI to set up a meeting with KAI ZHENG. At that meeting,
ZHENG agreed to supply CD-1 with 5000-10,000 ecstasy pills from MAI's
supply every two to three weeks via Federal Express package.  ZHENG
supplied CD-1 with approximately 150,000-170,000 ecstasy pills in this
manner over the next year.  CD-1 would pay for each shipment by sending
cash back to ZHENG via Federal Express package to a mail drop provided
by ZHENG with a fictitious name.

26. During the search of ZHENG's house in April 2003, officers
found an empty Federal Express package from Houston, Texas addressed to
ZHENG's mail drop at 298 4th Avenue, San Francisco (see paragraph 16
above), in the fictitious name of Leo Young, a ZHENG alias (see
paragraph 15e above).

33

## VII. INVOLVEMENT OF MAI AND LISA LEE IN MONEY LAUNDERING IN 2001

27.   This section details the involvement of MAI and LISA LEE in
the laundering of the proceeds of MAI's MDMA trafficking in 2001.
Section IV, Paragraph 10 of this affidavit details the laundering of
approximately $250,000 cash by ZHI EN HUANG and LISA LEE that took
place in April 2001 when HUANG gave CI-2 the cash to transport out of
the United States to LISA LEE in Amsterdam.   This section deals
specifically with approximately $409,000 in financial transactions
connected to the purchase of MAI's and LISA LEE's residence at 5019
Crystal Ridge Court, Oakland in 2001.

28. JOHNSON MAI's and LISA LEE's joint federal income tax returns
show the following adjusted gross income:

   (a) 1998:  $11.00
   (b) 1999:  $598.00
   (c) 2000:  $799.00
   (d) 2001:  $28,280
   (e) 2002:  $88,241
   (f) 2003:  $67,810

MAI reported "foreign income" on his tax returns in the following
amounts:  $13,900 (1998), $10,000 (1999), $12,000 (2000), $10,000
(2001, listed as "misc. income"), $48,000 (2002), and $35,000 (2003).
MAI listed his foreign income as deriving from his position as manager
of the Xing Jing Trading Company in Guangzhou, China.   In April 2005,
the ICE Attache, Beijing, China, queried business registration
information maintained by the Guangdong Provincial Administration of
Industry and Commerce, the government authority for private enterprise

34

in Guangzhou, China, and found that Xing Jing Trading had been incorporated in 1995 with Ding Renhua listed as its legal representative. However, since February 2002 the company has been suspended for failure to file for an annual examination since 2000.

29. In contrast to the relatively minimal income declared on MAI's and LEE's tax returns, Bank of America, Wells Fargo Bank, Washington Mutual, and HSBC records show that between September 2000 and December 2003, MAI and LEE held at least six bank accounts in the San Francisco Bay Area that received a grand total of $1,658,500 in deposits, exclusive of transfers between accounts. The bulk of these funds were used to purchase personal property for MAI and LEE (see also paragraphs for further details). For example, JOHNSON MAI and LISA LEE used funds from their Bank of America account to purchase in October 2001 a Mercedes Benz for $94,000 (a cashier's check drawn on funds from this account) and in August 2002 a Land Rover for $43,000 (another cashier's check drawn on funds from this account), and in July 2005 a Porsche Cayenne for $101,000 (down payment of $30,000).

30. US Immigration records show that ZHANG YUE is the mother of JOHNSON MAI. YUE's Immigration file shows that on September 18, 2000 the United States Consulate in Guangzhou, China issued a tourist visa to YUE, who arrived in San Francisco in October 2000. While in the United States on this tourist visa, YUE opened three bank accounts with cash deposits at United Commercial Bank and Bank of Canton in San Francisco, according to United Commercial Bank records. Between November 29, 2000 and March 5, 2001, these accounts received $32,000 in cash deposits. On March 12, 2001, YUE's Bank of Canton account

35

received a wire transfer of $219,985 from the Hong Kong bank account of Mai Yang Chu ($21,000 of this was transferred to YUE's United Commercial Bank account four days later). According to US Immigration records, Mai Yang Chu is the father of JOHNSON MAI. On March 16, 2001, YUE's United Commercial Bank account received a wire transfer of $148,954 from the Mai Yang Chu's Hong Kong bank account. Additionally, US Customs records show that on March 17, 2001, LISA LEE arrived at San Francisco Airport from an unknown foreign location (see paragraphs 49, 50, and 55 for other LEE international travel coinciding with Hong Kong wire transfers).

31. On April 27, 2001, ZHANG YUE purchased property located at 5019 Crystal Ridge Court, Oakland, California for $638,000. The down payment of $409,221.90 consisted of a $19,000 check from the Washington Mutual account of LISA LEE, a cashier's check for $190,221.90 from ZHANG YUE's United Commercial Bank account, and a cashier's check for $200,000 from YUE's Bank of Canton account. Significantly, the down payment was funded entirely by cash deposits into ZHANG YUE's bank account and the two wire transfers from Hong Kong into YUE's account.

32. The First American Title Company escrow file for purchase of 5019 Crystal Ridge Court shows that at the time of the initial deposit for the purchase of the property (made by a personal check from the account of LISA LEE), the buyer of the property was to be Rong An Lee, the father of LISA LEE (see paragraph 14 above). Without explanation, during the process of purchasing the property, the buyer changed to ZHANG YUE, JOHNSON MAI's mother. A notation in the file states, "the

clients are very strange, always have to meet them outside their
house."

33. In addition to the seamless transition in potential ownership
for Crystal Ridge from Rong An Lee to ZHANG YUE, other factors show
that YUE was a nominee owner for the property on behalf of MAI and LISA
LEE.  According to United States Immigration records, ZHANG YUE, the
mother of JOHNSON MAI, only applied to become a legal resident of the
United States in 2002, and obtained a social security number some time
after that application.  In her application to become a legal resident,
YUE listed her occupation as "retired since October 1990."  Yet on her
application for a loan for the purchase of Crystal Ridge Court, YUE
listed an income of $6700 as the owner of a printing company, Yee Sheng
Company, in China.  The ICE Attache in China has found no record of
that company, and found that the address at which YUE listed the
company does not exist.  Additionally, IRS records show that YUE has
never filed a tax return in the United States, but United Commercial
Bank records show that between late 2000 and March 2003 her three banks
accounts received deposits totaling $746,146.  In August of 2004, ICE
Special Agents examined the contents of the trash in front of 5019
Crystal Ridge Court, and found ample evidence that MAI and LISA LEE
resided there, including numerous financial records in their name and
report cards for their children.  Furthermore, in the summer and early
fall of 2002, CD-5 (see paragraph 22b above) stayed frequently at 5019
Crystal Ridge Court and observed that MAI, LEE, and their two children
were the only residents of the property.  Additionally, MAI made
statements in CD-5's presence about trying to find couriers to carry
his cash to Hong Kong.

37

## VIII. INVOLVEMENT OF KAI ZHENG IN MONEY LAUNDERING IN 2001 AND 2002

34. This section details laundering of the proceeds of MDMA trafficking by KAI ZHENG in connection with the $500,0000 down payment on the purchase of his home in September 2002, as well as cash transactions of over $226,000 by ZHENG between January 2001 and August 2003.

35. During the search of KAI ZHENG's house in April 2003 (see paragraph 15), officers found a wire transfer receipt for $500,000, which was wired from an account in Hong Kong to ZHENG's Oakland bank account on July 26, 2002. Shortly thereafter, ZHENG used funds from this Oakland account for a down payment on the purchase of his residence for $1,100,000. Bank records obtained from Hong Kong show that these funds originated in HSBC Hong Kong bank accounts in the name of Sui Ming Li, who according to U.S. immigration records, is the sister of LISA LEE and periodically resides at 823 East 24th Street, Oakland when in the United States. These records show that Sui Ming Li made the following cash deposits in Hong Kong (totaling $693,700):

     a) August 27, 2001 -     $189, 500 in cash (USD);

     b) November 22, 2001 -   $50,000 in cash (USD);

     c) November 23, 2001 -   $50,000 in cash (USD);

     d) January 15, 2002 -    $128,300 in cash (USD);

     e) February 7, 2002 -    $58,900 in cash (USD);

     f) February 26, 2002 -   $88,500 in cash (USD);

     g) August 26, 2002 -     $49,500 in cash (USD);

     h) September 17, 2002 - $79,000 in cash (USD).

On July 15, 2002, Sui Ming Li wired transferred $500,000 from her HSBC Hong Kong account to the HSBC Hong Kong account held by ZHENG's mother, Mei Xia Chen.  The $500,000 dollars was then wired transferred on September 23, 2002 to the Wells Fargo Bank account of KAI ZHENG in Oakland, California and used as a down payment for the purchase of 12645 Skyline Blvd., Oakland. In addition to the cash deposits made by Sui Ming Li on KAI ZHENG's behalf in Hong Kong, Hong Kong bank records also show that Mei Xia Chen's HSBC Hong Kong account received two additional cash USD deposits on July 7-8, 2002, of $40,700, and on September 20, 2002, of $140,000.

    36.    Furthermore, Wells Fargo bank records show that between January 2001 and August 2003, KAI ZHENG's bank account received an additional $106,728 in cash deposits.  Also, Paul Wallace, Vice-President of Sunshade Holdings, Inc. reported to US Customs agents that ZHENG made investments in his company of $20,000 cash on January 3, 2003 and $100,000 cash on March 25, 2003.  Internal Revenue Service records show that ZHENG declared an adjusted gross income of $19,516 for 1998, $36,615 for 1999, $50,841 for 2000, and $68,400 for 2001.  I know from my training and experience that this level of income is insufficient to explain the large wire transfers and cash transactions conducted by and for KAI ZHENG during this time frame.

## IX. INVOLVEMENT OF MAI, ZHI EN HUANG, ERIC CAI, AND DAVID YUEN IN THE CONSPIRACY TO DISTRIBUTE MDMA:  2003-2004 HOUSTON

37. This section sets out evidence of the involvement of MAI, ERIC CAI, ZHI EN HUANG, and DAVID YUEN in the fourth phase of the conspiracy to distribute MDMA:  the distribution to Houston MDMA traffickers of approximately 207.5 kilograms (approximately 830,000 pills) of MDMA.  This section details the following:

(a) the involvement of CD-7 in the distribution of approximately 125 kilograms (500,000 pills) of MDMA (paragraph 38);

(b) corroborating DEA wiretap of CD-7 and surveillance of CD-7, MAI, and HUANG (paragraph 39);

(c) corroboration of CD-7's information by CD-8 (paragraph 40);

(d) corroborative Customs and Border Protection records (paragraph 41);

(e) the involvement of CI-9 in MDMA distribution with HUANG (paragraph 42);

(f) CD-10's knowledge of the MAI organization (paragraph 43);

(g) CD-1's involvement in the distribution of approximately 42.5 kilograms (330,000 pills) of MDMA (paragraph 44);

(h) corroborating DEA wiretap of CD-1's information (paragraph 45);

(i) corroborating surveillance of CD-1 (paragraph 46);

(j) corroborating pen register information (paragraph 47).
Additionally, the movement of large amounts of money by MAI and LISA LEE during this time frame is detailed in Section X.

38. CD-7 provided the following information about his involvement with the MAI organization:

40

(a) CD-7 first met ZHI EN HUANG (identified by photograph) in Los Angeles in 2003. HUANG was interested in having CD-7 work in the narcotics distribution business with him and told CD-7 to come to San Francisco if interested. Approximately one week later, HUANG introduced CD-7 to an Asian male named "UNCLE HONG" (identified by CD-7 from a photo as JOHNSON MAI) in San Francisco. CD-7 understood that MAI was one of the largest MDMA importers in the San Francisco Bay Area. Shortly after they were introduced, CD-7 began purchasing MDMA from MAI. On the first occasion, CD-7 purchased 60,000 MDMA tablets from MAI for $120,000.00. Over the course of the next year, CD-7 purchased in excess of 500,000 MDMA tablets from MAI, 50,000 to 80,000 on each occasion.

(b) CD-7 stated that the MDMA tablets were transported from the San Francisco Bay Area to Houston, Texas, in rental cars. CD-7 explained that MAI would call HUANG and say, "it's ready," referring to the MDMA ordered by CD-7. HUANG would arrange for a driver to pick up the MDMA tablets and meet with an associate of CD-7 from Houston. CD-7 told agents that he would arrange for a member of his/her organization to drive to San Francisco in a rental car to retrieve the tablets from HUANG'S driver. CD-7's driver would also take cash to San Francisco for payment of the MDMA tablets. CD-7 stated that on most occasions, his driver would take approximately $300,000.00 on each trip.

(c) CD-7 told agents that on one occasion he witnessed the transfer of money in the San Francisco Bay Area. Upon transferring the money to HUANG, CD-7 observed HUANG put the money in a suitcase and then place the suitcase in a Land Rover belonging to MAI. According to CD-7, this transfer took place at a little Chinese restaurant on the main Street in downtown Millbrae, California. HUANG actually used MAI's keys to enter the Land Rover. (NOTE: California Department of

41

Motor Vehicle records show that MAI owns a 2003 Land Rover bearing
California license 4ZAG995). This money was payment for a shipment of
MDMA tablets destined for Houston, Texas.

(d) During the course of their MDMA trafficking business, CD-7
had numerous conversations with MAI about his organization. MAI
boasted that he had been in the drug business for over ten years and
had never been arrested; that he could easily obtain fraudulent
passports to enable any member of his organization, including himself,
to flee to China in the event of an imminent arrest; that he had sent
30-40 million dollars in drug proceeds to China for investment there;
that no other MDMA trafficker in North America could compete with him
because of the quantity he dealt in. Previously, MAI had imported MDMA
directly from the Netherlands, but had lately switched to bringing MDMA
powder into Canada, where he had it pressed into pills at clandestine
laboratories. The MDMA was then transported across the border into the
United States in trucks driven by Indian/Middle Eastern men.


39. From approximately July through October 2003, DEA Houston
conducted a Title III wiretap investigation targeting CD-7. The
Houston investigation targeting CD-7 resulted in his arrest along with
seven other individuals in March 2004. CD-7 was charged with
conspiracy to possess ecstasy with intent to distribute. The
investigation resulted in the seizure of approximately 172,500 ecstasy
tablets, 5 pounds of crystal methamphetamine, $851,000.00 in U.S.
currency, 23 weapons including handguns and assault rifles, a
bulletproof vest, and 5 luxury vehicles. In September 2003, DEA
Houston received information over its wire intercept that CD-7 intended
to travel to the San Francisco Bay Area for the purpose of meeting with

sources of supply for ecstasy to discuss future purchases of narcotics. On September 17, 2003, agents with DEA Oakland observed CD-7 arrive at the San Francisco International Airport and enter a vehicle driven by ZHI EN HUANG. CD-7 and HUANG departed the airport and later eluded surveillance. On September 18, 2003, at approximately 2:40 P.M., agents observed CD-7 and HUANG meet with JOHNSON MAI at the Pacific Renaissance Plaza, located on 340 Ninth Street in Oakland, California.

40. CI-8 has provided the following information about his involvement with the MAI organization:

(a) CI-8 has known ZHI EN HUANG for many years, and that about 2000 or 2001 HUANG introduced CI-8 to MAI in San Francisco. At that time, HUANG was driving vehicles loaded with ecstasy from San Francisco to Houston, Texas on MAI's behalf. CI-8 recalls that sometime in late 2002 or early 2003, CI-8 met MAI at the Silver Dragon Restaurant in Oakland, with HUANG, LISA LEE, and KAI ZHENG (all identified by CI-8 by photos). MAI and ZHENG, whom CI-8 knew as "UNCLE HONG's boy", sat beside one another at the table and appeared to be close associates. CI-8 met with this same group of people on a second occasion about one month later at the same restaurant.

(b) In 2001, CI-8 met CD-7 in Houston. At that time, CD-7 was driving loads of ecstasy pills from California to Houston. In the latter part of 2002, CI-8 introduced CD-7 to HUANG and MAI. During this introduction, CD-7 told MAI that CD-7 could distribute about 200,000 ecstasy tablets per week. According to CI-8, CD-7 intended to transport the pills from San Francisco to Houston for distribution. After this initial meeting, CD-7 began acquiring large amounts of ecstasy pills from MAI on a regular basis. CI-8 lacked specific

43

information on how often this took place or the specific manner in which MAI provided the pills to CD-7.  CI-8 recalled that on one occasion, CD-7 purchased a pill press and ecstasy powder from MAI. In the late spring of 2004, following the arrest of CD-7, ZHI EN HUANG purchased a ticket for CI-8 to travel to China.  In China, CI-8 met with MAI, who discussed the recent arrests and solicited CI-8 assistance in future ecstasy distribution.  Following CI-8's return to the United States, HUANG called CI-8 and told him that MAI wanted CI-8 to "lay low for awhile".

41.  Customs and Border Protection records show that on May 21, 2004, MAI departed San Francisco for Hong Kong, returning on June 3, 2004.

42.  CI-9 provided the following information about his involvement with the MAI organization :

(a) CI-9 identified "UNCLE HONG" (CI-9 identified a photo of MAI as "HONG") as a large MDMA trafficker in the San Francisco Bay Area. CI-9 has not personally met MAI, but has seen him at a couple of parties in the Los Angeles area and once in Las Vegas during the summer of 2004.  According to CI-9, MAI is well known in the San Francisco Bay area for being the source of supply for pink-colored MDMA tablets with the imprint of a lady or woman's face.

(b) In the latter part of 2004, CI-9 purchased a large quantity of MDMA tablets from ZHI EN HUANG.  On the first occasion, CI-9 purchased 2000 ecstasy tablets for $6,000.  HUANG sent one of his "runners" from San Francisco to transport the tablets to CI-9 in Los Angeles.  On the second occasion, CI-9 purchased 3000 ecstasy tablets

44

for $9,000. The second transaction happened exactly like the first, with the same "runner" from San Francisco. CI-9 provided the "runner" with half the money at the time of purchase and the remainder about one or two weeks later. On the second transaction, CI-9 took several weeks to pay off the debt to HUANG. CI-9 did not purchase any other MDMA tablets from HUANG after the second transaction.

43. CD-10 identified JOHNSON MAI from a California driver's license photograph as an individual whom CD-10 knew as "UNCLE HONG." CD-10 stated that he has known MAI for approximately three years and has seen MAI in San Francisco and Los Angeles. MAI has offered to sell CD-10 ecstasy tablets, but CD-10 has never purchased MDMA tablets directly from MAI. CD-10 identified ZHI EN HUANG from a California drivers' license photograph as an individual CD-10 he knew as "GAO LO." CD-10 told agents that HUANG works closely with MAI.

44. CD-1 provided the following information about his involvement with the MAI organization during this time period:

(a) In September 2002, CD-1 learned from CAI and ZHENG that Johnny Li, his girlfriend, and another associate were murdered at Li's home in Union City, California. CAI later told CD-1 that he believed that ZHENG had orchestrated the murders after ZHENG learned that Li wanted to kill him in order to be the sole distributor of MAI's MDMA. CAI believed that DAIVD YUEN and/or YUEN's brother had actually committed the murders. In April of 2003 KAI ZHENG fled to Canada as a result of rumors about his role in the murders and subsequent pressure from law enforcement. DAVID YUEN of Oakland, California replaced ZHENG and Li as the primary distributor of ecstasy for JOHNSON MAI.

45

(b) In late 2003, CAI, again at CD-1's request, set up a meeting with DAVID YUEN whereby YUEN agreed to supply CD-1 with large quantities of MAI's ecstasy. From this time until October 2004, YUEN supplied CD-1 with approximately 328,000 ecstasy pills, generally in shipments of 100,000 pills each. In October 2004, following the delivery of a shipment of 100,000 pills, CD-1 called CAI and complained that the majority of the pills had been crushed and could not be sold. CAI attempted to mediate the subsequent dispute between CD-1 and YUEN, who would not talk directly to CD-1. Following this disagreement, CD-1 and YUEN no longer did business together.

45. From September 15 until November 14, 2004, DEA conducted a wiretap of the telephone of CD-1. During that time, agents intercepted numerous phone calls between ERIC CAI and CD-1 on Sunday nights and Mondays in which CAI detailed the earnings and losses of his bookmaking operation following the results of the NFL games for that particular weekend. On October 19 and 20, 2004, agents intercepted a series of calls between CAI and CD-1 in which CD-1 complained that he got "92" (a shipment of 92,000 pills) from "LO WU"(DAVID YUEN), in which "more than a thousand (pills) were broken" and that "lots of them break at the slightest touch". CD-1 asked CAI to "make time and call him (YUEN) now". CAI then passed on instructions from YUEN on to CD-1 to "use the less broken ones first" and later "to sell all the dead bodies (broken pills)." CD-1 continued to complain that he could not sell the pills, and CAI finally informed CD-1 that "LO WU (YUEN) did not feel like flying" out to see CD-1 to deal with the problem. CAI also asked CD-1 about ordering a "paper counting machine" (money counter) to count his (CAI's) "weekly $50,000 accounts." I believe this series of calls

refers to the final shipment of 100,000 MDMA pills from MAI and YUEN to
CD-1 (See paragraph 44b)

46. November 5-6, 2004, DEA agents in San Francisco conducted a
surveillance of ERIC CAI after he picked up CD-1 at San Francisco
Airport.  Additionally, on February 10, 2001, ICE agents observed CAI
and CD-1 meet at the Koi Palace Restaurant in Daly City, CA.  The next
day ICE agents observed CAI meet with MAI at the Koi Palace.

47. Between November 2004 and July 2005, various DEA pen
registers recorded 693 calls between cellular phones used by ERIC CAI
and DAVID YUEN, and 621 calls between phones used by CAI and JOHNSON
MAI, 746 calls between phones used by CAI and ZHI EN HUANG, 701 calls
between phones used by JOHNSON MAI and DAVID YUEN.

## X. INVOLVEMENT OF MAI AND LISA LEE IN MONEY LAUNDERING IN 2002 & 2003

48.  This section sets forth the involvement of MAI and LISA LEE
in the laundering of over $1,540,000 in MDMA trafficking proceeds used
to pay off their home in Oakland and then to purchase a new home at
1220 Kenilworth Road, Hillsborough.  This section will show that the
funds for these transactions derived from wire transfers from Hong Kong
bank accounts, and that many of those accounts show large US dollar
cash deposits into them at the same time that LISA LEE traveled to Hong
Kong.

49.  CD-1 has stated that in about 2002, ERIC CAI asked CD-1 if
he would be willing to carry a large sum of cash to Hong Kong on behalf
of MAI's organization.  CD-1 declined, but later learned from CAI that

47

LISA LEE, MAI's wife, and Ada Zheng, KAI ZHENG's wife, had carried a very large amount of cash to Hong Kong for the MAI trafficking organization, while Ada Zheng was seven or eight months pregnant (see paragraph 50 below). Additionally, CD-5 provided information that MAI attempted to recruit couriers to carry cash to Hong Kong (see paragraph 22b above), and CI-2 served as a courier of a large amount of cash for LISA LEE (see paragraph 10). Furthermore, MAI boasted to CD-7 that he had sent millions of dollars in drug proceeds to China (see paragraph 38d).

50. US Customs records show that on August 4, 2002, LISA LEE and Ada Zheng arrived in Hong Kong from San Francisco. These records further show that LEE and Zheng returned to San Francisco from Hong Kong on August 11, 2002. (See information provided by CD-1, paragraph 49 above) Additionally, US Customs records show that on August 30, 2002, Rong An Li, LISA LEE's father, returned to San Francisco from a foreign destination. Bank records from Hong Kong show that during and shortly after LISA LEE's stay in Hong Kong, the following US dollar cash deposits, totaling $1,018,100 took place there:

(a) On August 9, 2002, LEE opened a US dollar bank account at HSBC in Hong Kong, and that account received a total of $310,000 in cash deposits on that day. On one of the deposit, the teller took the identification of the depositors, Sui Ming Li (LISA LEE's sister, who resides in Hong Kong, see paragraph 35 above) and Rong An Li (LISA LEE's father, see paragraph 7 above ).

(b) Between August 5 and August 9, 2002, Kuan Un Tai, opened two US dollar bank account at HSBC in Hong Kong and deposited $430,000 in cash in those two accounts. US Immigration records show that Kuan Un

48

Tai, also known as Un Tai Guan, applied to become a legal permanent resident of the United States in 2004. Prior to that Guan resided in Macao, adjacent to Hong Kong. Guan is believed to be the brother of Annie Guan, the mother of LISA LEE.

(c) On September 17, 2002, Kuan Un Tai deposited $278,100 cash into his US dollar HSBC account.
These funds were later used as part of the down payment on the purchase of 1220 Kenilworth, Hillsborough (see paragraph 56 below).

51. US Customs record show that on January 3, 2003, Zhang Yue, MAI's mother, departed San Francisco to Hong Kong, and that on January 16, 2003, Annie Guan, Lisa LEE's mother, departed San Francisco to Hong Kong. On January 23, 2003, Yue and Guan returned to San Francisco from Hong Kong. Hong Kong bank records show that between January 21 and January 23, 2003, while in Hong Kong on this trip with LISA LEE's mother, Yue deposited a total of $330,000 cash into her two US dollar accounts at HSBC in Hong Kong. These funds were later used to pay off the house at 5019 Crystal Ridge Court, Oakland (see paragraph 54 below).

52. Hong Kong bank records show that on June 5 and 6, 2003, Shao Fen Mai (relationship to JOHNSON MAI unknown), deposited $150,000 cash into his US dollar account at HSBC in Hong Kong. These funds were later used as part of the down payment for the purchase of 1220 Kenilworth Road, Hillsborough (see paragraph 56 below).

53. US Customs and Border Protection (CBP) records show that LISA LEE and ZHI EN HUANG, departed San Francisco International Airport

for Hong Kong on July 15, 2003 and returned on August 4, 2003. CBP
records also show that on July 21, 2003, Zhang Yue departed San
Francisco for Hong Kong and returned to San Francisco on August 6,
2003. CBP also show that Annie Guan left San Francisco for Hong Kong
on July 21, 2003, and returned on August 5, 2003.

54. Bank records show that on August 2, 2003, $249,983 (derived
from the $330,000 cash deposited during her January 2003 trip, see
paragraph 51 above) was wire transferred from Zhang Yue's HSBC US
dollar account in Hong Kong to the United Commercial Bank account of
Zhang Yue in San Francisco. On August 11, 2003, Yue purchased a
cashier's check for $233,339.95 from that United Commercial Bank
account and used it to pay off the remaining mortgage on the Crystal
Ridge property, held by Washington Mutual. In December of 2003, MAI
and LEE purchased property at 1220 Kenilworth, Hillsborough (see below)
and moved to that property in the late summer of 2004. On December 15,
2004, Zhang Yue sold the Crystal Ridge property and received a check
for $874,438.73, representing the proceeds of the sale. Yue deposited
those funds into a United Commercial Bank Money Market account.

55. CBP records show that LISA LEE flew from San Francisco to
Hong Kong on December 3, 2003, returning on December 5, 2003.
According to Hong Kong bank records, immediately preceding and during
LEE's short trip to Hong Kong, the following wire transfers from Hong
Kong to San Francisco, totaling $1,215,000 took place:

(a) On December 1, 2003, Kuan Un Tai (see paragraph 50b above)
sent a wire transfer of $150,000 from his HSBC us dollar account in
Hong Kong to the Bank of America account of LISA LEE in Oakland.

50

(b) On December 4, 2003, Tai sent a wire transfer for an additional $515,000 from his HSBC US dollar account in Hong Kong to the Bank of America account of LISA LEE in Oakland.

(c) Also on December 4, 2003, Shao Fen Mai (see paragraph 52 above) sent two wire transfers of $150,000 and $100,000 from her US dollar accounts at HSBC and Wing Hang Bank in Hong Kong to the HSBC account of JOHNSON MAI in Oakland.

(d) On December 5, 2003, LISA LEE, wire transferred $300,000 from her US dollars HSBC account in Hong Kong to her Bank of America account in Oakland.

56. With the funds received as a result of the wire transfers that took place during LISA LEE's trip to Hong Kong, JOHNSON MAI and LISA LEE, obtained cashier's checks on December 23, 2003 from their HSBC and Bank of America accounts for $807,131.88 and $413,000, respectively, for a total of $1,220,131.88. These checks were drawn directly on the funds received on December 1-5, 2003 in wire transfers from Hong Kong (a total of $1,215,000). Also on December 23, 2003, Zhang Yue obtained a cashier's check for $25,000 drawn on her Bank of America account. These three checks, together with a November 28, 2003 personal check for $25,000 drawn on LISA LEE's Bank of America account, constituted a down payment of $1,290,131.88 for the purchase of property at 1220 Kenilworth Road, Hillsborough, California by JOHNSON MAI and LISA LEE on December 30, 2003. The total purchase price for the property was $1,937,000. Sometime in the late summer of 2004 MAI and LI moved from 5019 Crystal Ridge Court in Oakland to this property.

51

## XI. INVOLVEMENT OF ERIC CAI IN MONEY LAUNDERING 2002-2005

57. This section sets out the involvement of ERIC CAI in the laundering of drug proceeds and gambling proceeds between 2002 and 2005. This section details the following:

(a) CD-1's knowledge of CAI's money laundering activities (paragraph 58);

(b) CI-11's involvement with CAI's money laundering activities (paragraph 59);

(c) the investigation of CAI's "legitimate" income (paragraph 60);

(d) CAI's purchase of 166 Los Robles Drive, Burlingame with $335,000 in laundered funds (paragraph 61);

(e) the laundering of $143,250 of CAI's illegal proceeds through Stephanie Cai's account (paragraph 62);

(f) the laundering of $62,750 CAI's illegal proceeds through Zhao Ren Cai's account (paragraph 63);

(g) CI-12's knowledge of CAI's money laundering activities (paragraph 64).

58. CD-1 provided the following information regarding ERIC CAI's money laundering activities. CD-1 has known ERIC CAI since late 1980s. Since that time CAI's primary source of income has been as a bookmaker. CD-1 has never known CAI to hold a legitimate job. CAI's bookmaking operation focuses on NFL games in the fall and winter, although he also takes bets on basketball games, albeit on a much smaller scale. CAI uses the same system as gambling professionals offshore and in Las Vegas. CAI's family, including his sister, Stephanie Cai, and father, Zhao Ren Cai, are fully aware as to how ERIC CAI makes his living, and

52

help him in money matters.  In return for CAI finding distributors for
his ecstasy, JOHNSON MAI allowed CAI to borrow from the vast amount of
cash realized from MAI's drug smuggling operation, thus enabling CAI to
greatly expand his bookmaking operation by increasing the number of
bets he could cover on any given Sunday.  As a result of MAI's backing,
CAI was able to take in an average of $30,000 in bets per game per
Sunday during football season (for a total of over $400,000 per week).
CD-1 placed an annual average of $5000 in bets with CAI from Houston.

        59.  CI-11 provided the following information regarding ERIC
CAI's money laundering activities:

        (a) CI-11 has known ERIC CAI since high school, and that CAI has
never held a legitimate job.  CAI's primary source of income has been
as a bookmaker, but he has also been involved in the drug business with
"UNCLE HONG" (JOHNSON MAI), who imported large amounts of ecstasy into
the United States.  CAI assisted CI-11 in obtaining ecstasy from MAI
for distribution.

        (b) In 2004, CAI approached CI-11 to launder $100,000 of his
illicit cash through CI-11's businesses.  In July 2004, Stephanie Cai,
ERIC CAI's sister, wire transferred $62,000 from her bank account to
CS-11's account as part of this "investment."  Over the next year, CS-
11 and his girlfriend wrote checks in amounts under $10,000 from their
bank accounts to Stephanie Cai and Zhao Ren Cai, ERIC CAI's father,
until the entire $100,000 had been laundered.  ERIC CAI directed CI-11
to write the checks out to his sister and father.

        (c) In 2005, CAI again approached CI-11 to launder $300,000 of
CAI's money, but CS-11 declined.

(d) CI-11's Bank of America account shows the receipt of $62,000 wire transfer on July 27, 2004 from STEPHANIE CAI's Washington Mutual account (3743130522)(see paragraph 62 below).


60. In Paragraphs 58 and 59, CD-1 and CI-11, both of whom have known CAI for his entire adult like, asserted that CAI has never held a legitimate job. Investigation by Immigration and Customs Enforcement (ICE) indicates that CAI is claiming legitimate income of approximately $40,000 per year from employment at Seasonal Art Sushi in Redwood City, but that he does not actually work there (see below).    The Employment Development Department of California furnished information regarding the employment ERIC CAI. CAI received wages for the 1st, 2nd and 3rd quarters of 2005 from All Season Sushi, Redwood City, CA. ERIC CAI's W-2 form for the year 2005 shows that CAI's wages were $43,200 from Seasonal Art, Inc. On March 9, 2006, ICE agents interviewed the owner of Seasonal Art Sushi, Sai Chu, in Redwood City, CA regarding ERIC CAI's employment. Chu stated that CAI was a full-time chef at his restaurant, who worked during lunch and dinner times, five days a week. When asked why CAI was not present at the restaurant, Chu replied that CAI has asked for a few weeks off to deal with personal issues. Chu said that he had employed CAI for about three years and paid him about $3,000 per month. Chu appeared extremely nervous during the interview. Additionally, almost every day during February and March 2005, and periodically thereafter, DEA and ICE conducted surveillance of ERIC CAI, and surveillance agents never saw CAI go to Seasonal Art Sushi. Currently the monthly mortgage of $4,000 is being paid from ERIC CAI's Wells Fargo Bank account. The amount of the mortgage far exceeds his "legitimate" income from Seasonal Art Sushi, Inc.

61. In Paragraph 58 above, CD-1 asserted that ERIC CAI's family is aware that ERIC CAI makes his living through illegal activity, and assists him in money matters. Additionally, in paragraph 49 above, CD-1 asserted that CAI had previously solicited CD-1 to carry illicit cash to Hong Kong, presumably for purposes of laundering that cash. Additionally, Section VII, VIII, and X of this affidavit have shown that since at least 2001, the JOHNSON MAI organization has smuggled over $3,000,000 in cash out of the United States to Hong Kong, where it was deposited into bank accounts held by friends and relatives of MAI. These sections further showed that when MAI and KAI ZHENG purchased their homes in the San Francisco Bay Area, MAI and ZHENG received large wire transfers from those Hong Kong bank accounts to finance the down payments on these properties. The purchase of 166 Los Robles Drive, Burlingame by ERIC CAI has revealed a similar pattern, i.e., large wire transfers from Hong Kong to finance the down payment of this property (see below). Furthermore, these wire transfers went not to CAI's account, but to the accounts of his sister, Stephanie Cai, and his father, Zhao Ren Cai:

(a) ERIC CAI and Zhao Ren Cai purchased 166 Los Robles, Burlingame on December 13, 2002 for $1,275,000. The Fidelity National Title escrow file for the purchase shows that the CAIs' made a down payment totaling $635,000 and took a loan from CHL Mortgage in San Ramon, CA for the remainder of the purchase price.

(b) The down payment consisted of two personal checks and five cashier's checks as follows:

i) a $10,000 personal check from Washington Mutual Bank account (8611704425) of Zhaoren CAI and Yue Ying Li;

ii) a $28,000 personal check from the Wells Fargo Bank account (0117484303) of ERIC CAI;

iii) a $22,000 cashier's check drawn from ERIC CAI's Wells
Fargo Bank account (see above);

iv) a $25,000 cashier's check drawn from the Bank of AmERICa
account (283904915) of Vinh Ly (the brother-in-law of CAI);

v) a $95,000 cashier's check drawn from the Washington Mutual
account of Zhaoren CAI and Yue Ying Li (see above);

vi) a $155,000 cashier's check drawn from the Washington
Mutual Bank account (3743130522) of Stephanie CAI;

vii) a $300,000 cashier's check from Washington Mutual Bank
line of credit (account 0069978518) taken by Stephanie CAI.

(c) Washington Mutual Bank records for account 86117004425 in
the names of Zhao Ren Cai and Yue Ying Li (CAI's mother) show that
prior to the withdrawal of $95,000 from the account for the purchase of
the cashier's check for a portion of the down payment, Cai's and Li's
account received the following two wire transfers from Hong Kong
totaling approximately $50,000.

i) on October 4, 2002, a wire transfer for $19,982 from Bank
of China (Hong Kong) account 672011000101 (No. 01468810000938 also
listed under "originator address") in the name of Chan Lai Ha.

ii) on November 19, 2002 a wire transfer for $30,000 from HSBC
Hong Kong account 183362516838 (ID Code of 000044415 also listed) in
the name of Standard Printing Supplies Limited, Flat f, Blk A, Tung
Chung Industrial Building, 9-11 Cheong Wing Rd.

iii) on November 13 and November 21, 2002, the account
received branch deposits of United Commercial Bank and Bank of Canton
cashier's checks in the amount of $17,991 and $23,000, respectively, as
well as additional unknown deposits totaling $19,000 in late November
and early December of 2002.

(d) Washington Mutual Bank records for account 3743130522 in the name of Stephanie Cai show that prior to the withdrawal of $155,000 from the account for the purchase of the cashier's check for a portion of the down payment, Stephanie Cai's account received the following five wire transfers from Hong Kong totaling approximately $138,000:

i) on June 3, 2002, a wire transfer for $19,914.73 from Hang Seng Bank (83 Des Voeux Road, Hong Kong), in the name of Lee Clifford Yi Chang;

ii) on July 8, 2002 a wire transfer for $21,510.46 from Hang Seng Bank Ltd (83 Des Voeux Road, Hong Kong), account 10949551 in the name of Lee Clifford Yi Chang;

iii) on August 29, 2002, a wire transfer for $21,909.46 from Hang Seng Bank Ltd (Flat A, 6/f, Blk 13, Laguna City, Kowloon) account 36359001121in the name of Miss Chan Lai Ha (same name as the transfer on October 4, 2002 into Zhaoren CAI's account);

iv) on September 19, 2002, a wire transfer for $24,902.29 from the same Chan Lai Ha Hang Seng Bank account;

v) on November 6, 2002, a wire transfer for $39,864.98 from the same Chan Lai Ha account;

vi) on December 3, 2002, this account received a $42,000 "telephone transfer" following the purchase of the house.

62. In paragraph 59 above, CI-11 detailed how ERIC CAI laundered his illicit proceeds through the accounts of his sister, Stephanie Cai, and his father, Zhao Ren Cai. This investigation corroborates CI-11's information, and shows that ERIC CAI used his sister's and father's bank accounts to pay down the loan used to purchase 166 Los Robles, as well as to simultaneously launder the proceeds of his bookmaking and MDMA operations. The $300,000 cashier's

check purchased by Zhao Ren Cai for part of the down payment was drawn from a line of credit at Washington Mutual Bank obtained by Stephanie Cai. Payments on the loan have been made by Stephanie Cai and Zhao Ren Cai from their respective Washington Mutual Bank accounts totaling $114,000 between January 2002 and March 2005, so that the principle is now below $200,000. On a loan application for a Porsche purchased in early 2005, Stephanie Cai listed her occupation as a pharmacist at Alameda Medical Center, 1411 East 31st St., Oakland, CA with a gross monthly income of $4,000 and Vinh Ly's (Stephanie's husband) occupation as a pharmacist with Kaiser at 300 Pullman Street, Livermore, CA with a gross monthly income of $4,500. Stephanie Cai's Washington Mutual account 3743130522 has received the following $86,250 in suspicious deposits since the purchase of the subject property:

a) at least $21,000 in cash deposits, all in amounts of $3,000 or less;

b) a US dollar draft for $6,500 from Scotiabank in Edmonton, Alberta, Canada;

c) four checks for $9,000 each (for a total of $36,000) from Houston Bank of America account of the girlfriend of CI-11 (see paragraph 59b above);

d) five checks totaling $22,750 from persons/subscriber addresses called frequently by ERIC CAI according to the pen register on his phone.

Stephanie Cai's Washington Mutual account 3930879082 has received the following $57,000 in suspicious deposits since the purchase of the defendant property (NOTE: Not all deposit items could be reviewed):

e) at least $10,000 in cash deposits;

f) a $17,920.96 wire transfer on July 21, 2004 (six days before the wire transfer of $62,000 to CI-11) from Clifford Yi Chang

58

Lee in Hong Kong, the same individual responsible for two wire transfers of over $40,000 to Stephanie Cai's other account prior to the down payment on the defendant property;

g) a $9,000 check from Houston Bank of America account of CI-11's girlfriend (see paragraph 59b above);

h) two checks totaling $11,750 from subscribers of phones that pen register records show as frequent callers to ERIC CAI's cellular phone from November 2004 to July 2005;

i) an $8,000 check from Sai Lai Chu, the owner of Seasonal Arts Sushi (ERIC CAI's ostensible employer, see paragraph 60 above).

63.    Zhao Ren Cai's Washington Mutual account 8611704425 has received the following $62,750 in suspicious deposits since the purchase of the property:

a) at least $10,000, in cash deposits;

b) two dollar drafts for $5,000 each from the Scotiabank, Edmonton, Alberta, Canada;

c) two $9,000 checks from CI-11's Bank of America account (see paragraph 84 above);

d) six checks totaling $24,750 from persons/subscriber addresses called frequently by ERIC CAI according to pen register records.

Zhao Ren Cai's account also show that in November 2002, just prior to the purchase of a $95,000 cashier's check from this account for the down payment of the defendant property, the account received $18,000 and $23,000 from Zhao Ren Cai's United Commercial Bank account and Bank of Canton account. Prior to the transfer of approximately $50,000 from these accounts, cash deposits in the amounts of $11,500 into the United

59

Commercial Bank account and $7,500 into the Bank of Canton bank
account.

64. CI-12 provided the following information about his
knowledge of ERIC CAI's money laundering. In 2002 ERIC CAI provided
CI-12 with $50,000 cash to help him start a business. CI-12 had known
CAI for at least 15 years, had never known him to hold a legitimate
job, and knew he made a living as a bookmaker. CI-12 repaid CAI by
writing checks initially in 2002 to CAI, and then, at CAI's direction,
by writing checks in 2004 to Stephanie Cai and Zhao Ren Cai. At that
time (2004), CAI told CI-12 that those funds were going towards payment
for his (CAI's) house.

## XII. PROBABLE CAUSE SUMMARY FOR SEARCH WARRANTS

65. Based on the information contained in this affidavit, I
believe probable cause exists that JOHNSON MAI, LISA LEE, KAI LUN
ZHENG, ZHI EN HUANG, DAVID YUEN, and ERIC CAI have committed the
criminal offenses identified above. Below, I provide a summary of the
probable cause for the search of locations associated with these
individuals.

66. Based on the facts presented in this affidavit, I believe
that JOHNSON MAI and LISA LEE have resided at 1220 Kenilworth Road,
Hillsborough, since August of 2004, that MAI and LEE have conspired to
distribute MDMA and launder the proceeds of MDMA trafficking since at
least 2001, and that a search of that residence will result in the
seizure of items listed in Attachment No. 1 to the Application for
Search Warrants. Utility checks conducted in July 2006 confirm that

60

XIAO LING LI (LISA LEE) is the subscriber at that address. Furthermore, periodic surveillance of 1220 Kenilworth Road by ICE Special Agents in May and June of 2006 has resulted in the observation of MAI's Land Rover and Porsche Cayenne parked adjacent to the property, which is currently undergoing a major renovation.

67. Based on the facts presented in this affidavit, I believe that Rong An Li and Annie Guan, LISA LEE's parents, have resided at 823 East 24th St., Apartment 1, Oakland since at least the early 1990s, that Rong An Li and Annie Guan have assisted MAI and LISA LEE in laundering the proceeds from MDMA trafficking, and that a search of that residence will result in the seizure of items listed in Attachment No. 1 to the Application for Search Warrants. Utility checks conducted in July 2006 confirm that Rong An Li is the subscriber at that address. Furthermore, during surveillance conducted in May 2006, DEA agents observed Rong An Li exit from that apartment and check his mailbox. As detailed in paragraph 14 above, in 2004 ICE and IRS agents observed one of the Schimmel pianos used to smuggle MDMA in 2001 in this apartment.

68. Based on the facts presented in this affidavit, I believe that ZHI EN HUANG, during the time frame of this affidavit resided, and continues to reside, at 1927 Bridgepointe Circle, San Mateo, that HUANG has assisted JOHNSON MAI in the smuggling and distribution of MDMA since at least 2001, and that a search of that residence will result in the seizure of items listed in Attachment No. 1 to the Application for Search Warrants. Utility checks conducted in July 2006 confirm that ZHI EN HUANG is the subscriber at that address. Furthermore, during surveillance conducted on June 29, 2006, ICE agents observed HUANG depart from the underground parking lot beneath that apartment.

61

69. Based on the facts presented in this affidavit, I believe that DAVID YUEN, during the time frame of this affidavit resided, and continues to reside, at 3018 Humboldt Avenue, Oakland, that YUEN has conspired to distribute MDMA for the MAI organization since at least 2003, and that a search of that residence will result in the seizure of items listed in Attachment No. 1 to the Application for Search Warrants. Utility checks conducted in July 2006 confirm that DAVID YUEN is the subscriber at that address. Furthermore, during surveillance conducted in May 2006, DEA agents observed YUEN depart that residence.

70. Based on the facts presented in this affidavit, I believe that ERIC CAI has resided since December 2002 at 166 Los Robles Drive, Burlingame, that CAI has conspired to distribute MDMA for the MAI organization, that CAI has laundered proceeds derived from that activity, and that a search of that residence will result in the seizure of items listed in Attachment No. 1 to the Application for Search Warrants. Utility checks conducted in July 2006 confirm that CAI's mother, Yue Ying Li, is the subscriber for that address. Furthermore, during surveillance conducted in May 2006, ICE agents observed CAI depart that residence.

71. Based on the facts presented in this affidavit, I believe that Stephanie Cai, during the time frame of this affidavit resided, and continues to reside, at 335 Glasgow Circle, Danville, that Stephanie Cai has assisted ERIC CAI in the laundering of the proceeds of MDMA trafficking and illegal gambling, and that a search of that residence will result in the seizure of items listed in Attachment No.

62

1 to the Application for Search Warrants. Utility checks conducted in July 2006 confirm that Vinh Ly, Stephanie Cai's husband, is the subscriber at that address. Furthermore, on July 6, 2006, ICE agents observed Stephanie Cai depart from the garage at 335 Glasgow Circle.

Based on the above information I believe probable cause exists that JOHNSON MAI, LISA LEE, KAI LUN ZHENG, ZHI EN HUANG, DAVID YUEN, and ERIC CAI have violated Title 21, United States Code, Section 846 (Conspiracy to Distribute MDMA) and that JOHNSON MAI, LISA LEE, KAI LUN ZHENG, ZHI EN HUANG, and ERIC CAI have also violated Title 18 United States Code, Sections 1956 (a)(1)(A)(i), (a)(1)(B)(i), and (a)(2)(B)(Laundering of Monetary Instruments). I further believe that based on the above information, probable cause exists that located in the residences at 1220 Kenilworth Road, Hillsborough; 823 East 24th Street, Apartment 1, Oakland; 1927 Bridgepointe Circle, Apartment H344, San Mateo; 3018 Humboldt Avenue, Oakland; 166 Los Robles Drive, Burlingame; and 335 Glasgow Circle, Danville; all further described in Attachment No. 1 to the Application for Search Warrants, are evidence, fruits and instrumentalities, further describer in Attachment No. 2 to the Application for Search Warrants, of the above-referenced criminal offenses.

WHEREFORE, I request warrants to search the locations specified herein, as more particularly described in Attachment No. 1 to the Application for Search Warrants, to search for the items set forth in Attachment No. 2 to the Application for Search Warrants.

I further request that no bail arrest warrants be issued for JOHNSON MAI, LISA LEE, KAI LUN ZHENG, ZHI EN HUANG, DAVID YUEN, and ERIC CAI.

63

I further request, in order to avoid compromising this on-going investigation, to prevent the subjects' flight, and for the safety of the agents and officer, that this Application, Affidavit, and Complaint be filed under seal until further order of the Court.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.


ALEO BRUGNARA


SWORN AND SUBSCRIBED TO BEFORE ME

THIS 26 DAY OF JULY, 2006

BERNARD ZIMMERMAN
UNITED STATES MAGISTRATE JUDGE


64